# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of )<br>*The Person of Marco Polo Marquez* )<br> )<br>described further in Attachment A-3 )<br> )<br> )<br> )<br> ) | Case No.<br><br>2 0MJ 0 n 5 5 1 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *See Attachment B* | *See Attachment B* |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:_____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

Tom Cottam, HSI Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/6/20

STEVE KIM

*Judge's signature*

City and state: Los Angeles, California

STEVE KIM

*Printed name and title*

AUSA: Kevin Reidy – 213-894-8536

**ATTACHMENT A-3**

<u>PERSONS TO BE SEARCHED</u>

The person of Marco Polo MARQUEZ ("MARQUEZ"), date of birth July 20, 1994, with California Identification Number F5192039. MARQUEZ's California Department of Motor Vehicle records list him AS STANDING 5'10" tall with black hair and brown eyes.

The search of MARQUEZ shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within MARQUEZ's immediate vicinity and control at the location where the search warrant is executed.

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

i

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

f.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

g.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

      i.   Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs;

      j.   Contents of any calendar or date book;

      k.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

      l.   Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offenses, and forensic copies thereof.

      m.   With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

      i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

      ii.   evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security software designed to detect malicious software;

   iii. evidence of the attachment of other devices;

   iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   v. evidence of the times the device was used;

   vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

   vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

   viii. records of or information about Internet Protocol addresses used by the device;

   ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.    In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress MARQUEZ's or GONZALEZ's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MARQUEZ's or GONZALEZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

# AFFIDAVIT

I, Tom Cottam, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrants against Marco Polo MARQUEZ ("MARQUEZ")  and Genaro Cortes GONZALEZ ("GONZALEZ") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search a business premises known as Garcia's Wheels & Tires, 5650 Imperial Highway, South Gate, California (the "SUBJECT PREMISES") as described more fully in Attachment A-1, a T2140 commercial passenger bus, California License Plate Number 20995V2 and United States Department of Transportation ("USDOT") Number 2471850 (the "SUBJECT VEHICLE") as described more fully in Attachment A-2, and the persons of MARQUEZ and GONZALEZ as described more fully in Attachments A-3 and A-4.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, distribution, or importation of controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), United States Department of Homeland Security. I have been so employed since September 2018. As a Special Agent with HSI, I am authorized to investigate crime involving violations of federal law, including 21 U.S.C. § 841 (Unlawful Possession of Narcotics). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, GA. At FLETC, I was trained in, among other things, criminal investigative techniques, and drug smuggling and human trafficking investigations. Prior to working as a Special Agent with HSI, I was an Intelligence Research Specialist with HSI for four years. During that time, I assisted in conducting research to facilitate investigations of alleged human trafficking, narcotics smuggling, cybercrimes, visa security, and transnational criminal organizations. I have also been an Army Reserve intelligence warrant officer since

September 2015, during which time I received training in, among other things, counterterrorism, human trafficking awareness, and the collection and processing of sensitive documents and media.

6.     Since my employment with HSI, I have been involved in multiple drug-related investigations. I have worked and conferred with experienced agents/officers in the field of drug law enforcement, and drawn from their knowledge and experience. I have participated in numerous investigations into the unlawful importation, possession with intent to distribute controlled substances, and distribution of controlled substances, as well as conspiracies associated with criminal drug offenses. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, as well as various informants and cooperating sources. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by drug traffickers to smuggle and safeguard drugs, to distribute drugs, and to collect and launder related drug proceeds.

### III. SUMMARY OF PROBABLE CAUSE

7.     During the early morning hours of February 6, 2020, Customs and Border Patrol ("CBP") officers inspected the SUBJECT VEHICLE driven by MARQUEZ and with GONZALEZ as its sole passenger. During a preliminary inspection, a dog trained to detect narcotics alerted to the potential presence of contraband on the passenger side of the SUBJECT VEHICLE near the gasoline

tank compartment.  CBP officers referred the SUBJECT VEHICLE for
a secondary inspection by an x-ray machine.  The x-ray detected
multiple anomalies inside the SUBJECT VEHICLE gasoline tank that
appeared to be circular objects stacked on top of each other.
HSI agents then followed the SUBJECT VEHICLE until it parked
outside the SUBJECT PREMISES around 10:45 a.m. on February 6,
2020.  As of 12:23 p.m., the SUBJECT VEHICLE is still parked on
the street outside the SUBJECT PREMISES.

## IV. STATEMENT OF PROBABLE CAUSE

8.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

### A.  CBP Officers Discover Anomalies in Gas Tank of SUBJECT VEHICLE Driven by MARQUEZ with GONZALEZ as Sole Passenger

9.  During the early morning hours of February 6, 2020,
CBP officers encountered the SUBJECT VEHICLE as it attempted to
cross the border from Mexico into the United States at the San
Ysidro port of entry.  The SUBJECT VEHICLE was driven by MARQUEZ
and GONZALEZ was the only passenger.

10.  CBP officer Dennis Murray used a trained narcotics
detection dog to sniff the SUBJECT VEHICLE.  When the dog
sniffed near the SUBJECT VEHICLE's gas tank compartment on the
passenger side of the bus, it alerted to the potential existence
of contraband.

11.  At that time, CBP officers decided to conduct a
secondary search of the SUBJECT VEHICLE.  Because the x-ray
machine for commercial buses was located at the Otay Mesa port

of entry, CBP officers drove the SUBJECT VEHICLE from San Ysidro to Otay Mesa.

12.   Once the SUBJECT VEHICLE arrived at the Otay Mesa port of entry, officers conducted an x-ray search of the SUBJECT VEHICLE, including the gasoline tank.  The x-ray machine revealed a number of anomalies inside the gasoline tank.  The anomalies appeared to be circular objects stacked on top of each other.  After the search was completed, CBP officers drove the SUBJECT VEHICLE back to the San Ysidro port of entry.

**B.   HSI Agents Follow the SUBJECT VEHICLE to the SUBJECT PREMISES**

13.   After CBP discovered the anomalies inside the SUBJECT VEHICLE's gasoline tank, they alerted HSI special agents.  In an effort to discover the destination of the drugs and identify the intended recipients of the drugs, HSI agents allowed MARQUEZ and GONZALEZ to leave the San Ysidro port of entry inside the SUBJECT VEHICLE.  HSI agents then followed the SUBJECT VEHICLE from the San Ysidro port of entry and conducted constant surveillance of the SUBJECT VEHICLE until it arrived at its destination.

14.   At approximately 10:45 a.m., HSI agents saw the SUBJECT VEHICLE park right outside the SUBJECT PREMISES next to the entrance to the property.  The SUBJECT PREMISES is believed to be an automobile repair shop.  As of 12:23 p.m., on February 6, 2020, the bus is still parked outside the SUBJECT PREMISES.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

15.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences.

c.  Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to

6

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

   e.  Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

   f.  Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

   g.  Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug

trafficker lives with others who may be unaware of his criminal activity.

      h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

    16.  Based on my training and experience, drug importers often hide narcotics in the gasoline tanks of vehicles.  Drug importers hide narcotics inside gasoline tanks in order to avoid detection by law enforcement.  In my experience, an x-ray of a gasoline tank revealing multiple circular anomalies stacked on top of each other indicates the presence of narcotics inside the gasoline tank.

    17.  Based on my training and experience, drug importers often use auto repair shops to unload narcotics from gasoline tanks.  Auto repair shops employ persons familiar with automobiles who can disassemble a gasoline tank and remove the narcotics inside.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

18.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

     c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

   19.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

11

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MARQUEZ's or GONZALEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MARQUEZ's or GONZALEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

2.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

21.   For all of the reasons described above, there is probable cause to believe that Marco Polo MARQUEZ ("MARQUEZ") and Genaro Cortes GONZALEZ have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES, SUBJECT VEHICLE, and the person described in Attachments A-1, A-2, and A-3.

/s/
_____
Tom Cottam, Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me
this ___6___ day of February, 2020.


_____STEVE KIM_____
UNITED STATES MAGISTRATE JUDGE

13